**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SEA SIDE VILLAS II HORIZONTAL
PROPERTY REGIME; SEA SIDE VILLAS
II HOME OWNERS ASSOCIATION,
    *Plaintiffs-Appellees,*

    v.

SINGLE SOURCE ROOFING
CORPORATION; G.M. KASSEM ROOFING
SYSTEMS, INCORPORATED,
    *Defendants-Appellants.*

No. 02-2104

SEA SIDE VILLAS II HORIZONTAL
PROPERTY REGIME; SEA SIDE VILLAS
II HOME OWNERS ASSOCIATION,
    *Plaintiffs-Appellants,*

    v.

SINGLE SOURCE ROOFING
CORPORATION; G.M. KASSEM ROOFING
SYSTEMS, INCORPORATED,
    *Defendants-Appellees.*

No. 02-2114

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-99-3142-23)

Argued: April 3, 2003

Decided: May 2, 2003

Before WILKINSON and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by unpublished opinion. Senior Judge Hamilton wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

---

## COUNSEL

**ARGUED:** Michael Yablonski, MEYER, UNKOVIC & SCOTT, L.L.P., Pittsburgh, Pennsylvania, for Appellants. Michael S. Seekings, MULLEN, WYLIE & SEEKINGS, Charleston, South Carolina, for Appellees. **ON BRIEF:** Timothy W. Bouch, G. Hamlin O'Kelley, III, LEATH, BOUCH & CRAWFORD, Charleston, South Carolina, for Appellants.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

HAMILTON, Senior Circuit Judge:

In 1990, Sea Side Villas II Horizontal Property Regime and Sea Side Villas II Home Owners Association (collectively referred to as Sea Side) contracted with G.M. Kassem Roofing Systems, Inc. for the installation of a new roof on one of Sea Side's two condominium buildings located in the Town of Hilton Head in South Carolina. After experiencing numerous problems with the roof and failing in attempts to cure the problems, Sea Side brought an action against G.M. Kassem Roofing Systems, Inc. and Single Source Roofing Corporation in South Carolina state court alleging various claims based on the defective installation of the roof.[1] Following removal to federal court and a bench trial, the district court ruled in favor of Sea Side on its

---

[1] Single Source Roofing Corporation, a Pennsylvania corporation, is a successor to G.M. Kassem Roofing Systems, Inc. For ease of reference, we will refer to these entities as "SSR."

negligence claim, but held in favor of SSR on the remaining claims, including its counterclaim against Sea Side. The district court awarded Sea Side damages on its negligence claim in the amount of $85,900, which was *the original contract price*, and awarded SSR $11,086.86 on its counterclaim. SSR noted an appeal, and Sea Side noted a cross-appeal. For the reasons stated below, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I

A

Sea Side Villas II is a three-story condominium housing complex located in the Town of Hilton Head and consists of two multi-unit buildings. Sea Side Villas II Horizontal Property Regime is a horizontal property regime organized under the laws of South Carolina. Sea Side Villas II Home Owners Association is an organization which governs the affairs of the Sea Side Villas II condominium housing complex.

In 1990, Sea Side contracted with SSR to replace the existing roof on one of Sea Side's buildings (the Building). In exchange for a payment of $85,900, SSR was to install its "G.M. Kassem Roofing Systems, Inc. E.P.D.M. Ultra-NP Roof System" on the Building. (J.A. 587).

At the time of the roof installation, the Town of Hilton Head Building Code (the Code) mandated that, when the existing roof surface was gravel or the like, the gravel had to be removed and an approved base material installed before applying additional roofing. Notwithstanding the dictates of the Code, SSR installed the new roof directly over the existing roof without removing the existing gravel-based roofing surface.

In April 1991, SSR gave Sea Side two warranties, which included coverage for roofing materials, insulation, attachments, fasteners, membrane, the overall system, and the workmanship by SSR. One of the warranties, the "Membrane Systems Warranty," stated that it did

not apply if the roofing system was damaged by natural disasters including hurricanes and gales. (J.A. 433). The Membrane Systems Warranty also excluded coverage for consequential damages arising from the use or misuse of the roofing system. Finally, the "Membrane Material Warranty" stated that SSR "shall not be liable for any incidental, consequential, or other damages, including but not limited to, loss of profits or damages to the structure or its contents arising under any theory of law whatsoever." (J.A. 434).

A few months after the roof had been installed, leakage problems began to appear. Sea Side presented evidence at trial that the roof began to leak early in its life and often, and that the roof was torn in numerous places, particularly around fasteners which were used to secure the roof to the plywood deck. SSR made numerous attempts to repair the roof, but it failed to correct or cure the problems.

SSR believed that raccoons caused the leakage problems by puncturing the roofing membranes which, in turn, created holes in the roof. When SSR responded to the early service repair calls at the Building, it advised Sea Side that the problems were not covered under any of its warranties. SSR, however, made temporary repairs to the roof and it later submitted a $25,000 proposal to Sea Side to cover permanent repairs to the damaged roof. In December 1993, SSR agreed to address another roof leakage problem, which it again contended was damage not covered under either of the warranties issued to Sea Side.

When the leaks in the roof reappeared in 1996, Sea Side retained the services of Robert Baroni (Baroni), a roofing consultant and president of Associated Construction Consultants, Inc., to advise it about the roof problems and represent it with regard to further interaction with SSR. After conducting an inspection of the roof, Baroni concluded that the roof failed to provide the occupants of the Building with the requisite protection because: (1) "the fiberboard insulation had completely disintegrated underneath the rubber" and (2) a significant number of fasteners that were designed to hold the roofing structure together came apart. (J.A. 121).

In September 1998, Tropical Storm Earl moved through the Hilton Head Island area with a Beaufort Wind Scale rating of nine, which indicated the presence of winds in the range of forty-seven to fifty-

four miles per hour. The roof of the Building sustained further damage which exposed the interior structure of the Building to water damage. On or about September 4, 1998, SSR responded to Sea Side's service call. SSR indicated, however, that it wanted Baroni and a representative of the company that managed Sea Side to be present when the repairs were made. Upon arrival, SSR repair technicians informed Baroni that the repair work would not be undertaken unless SSR was given a guarantee of full payment in the amount of $11,086.86. Baroni, in the presence of a representative of the company that managed Sea Side, assured SSR that it would get paid. According to SSR, the repairs were excluded under the Membrane Systems Warranty because the damage was caused by gale force winds. Sea Side was of the opinion, however, that the cost of repairs fell under the warranties and refused to pay the $11,086.86.

Also on September 4, 1998, Alan Campbell (Campbell), an engineer with Campbell, Schneider and Associates, LLC, performed a visual survey of the Building's roof to determine the extent of the damage that had been caused by Tropical Storm Earl. Campbell testified at trial that, if the roof was installed in compliance with the Code, the fasteners on the roof should have been able to withstand "about 300 pounds [of pressure] in the corners, about 174 pounds along the edge, and over 500 pounds in the field area of the roof." (J.A. 231). Campbell further testified that the fasteners which held the roof together were rated only for 100 pounds of pressure and therefore did not meet Code requirements. Campbell concluded that the fasteners should have been attached to a steel deck rather than a plywood deck.

In February 2000, Sea Side contracted with Morris Roofing, Inc. to complete the reroofing of the Building at a cost of $165,000. The total cost of the demolition and reroofing the Building was $172,000.

B

In August 1999, Sea Side filed a complaint against SSR in South Carolina state court asserting claims for breach of contract, breach of express warranty, breach of implied warranty, and negligence. After SSR removed the action to the United States District Court for the District of South Carolina, SSR asserted a breach of contract counter-

claim based on Sea Side's failure to pay $11,086.86 for repairs SSR made to the roof in the aftermath of Tropical Storm Earl.

Following a bench trial, the district court found in favor of Sea Side on the negligence claim, but ruled in favor of SSR on the remaining claims, including its breach of contract counterclaim against Sea Side. The district court awarded Sea Side damages on its negligence claim in the amount of $85,900, which was *the original contract price*, and awarded SSR $11,086.86 on its breach of contract counterclaim. Following the entry of the judgment, both Sea Side and SSR moved to amend the judgment, and SSR further moved for a new trial. The district court denied the motions and this timely appeal and cross-appeal followed.[2]

## II

On appeal, SSR argues that the district court erred when it permitted the expert testimony of Baroni and Campbell asserting the admission of their testimony violated Rules 26 and 37 of the Federal Rules of Civil Procedure. According to SSR, the admission of Baroni and Campbell's testimony prejudiced its defense to all claims asserted by Sea Side, and in particular the negligence claim.

## A

The facts surrounding SSR's argument are as follows. On September 11, 2000, the district court entered an amended scheduling order directing the parties to complete discovery by March 15, 2001. Sea Side was directed to identify its expert witnesses by December 15, 2000 and SSR was to identify its expert witnesses by January 15, 2001. Nine months earlier, in January 2000, SSR had served written interrogatories and a document request that, *inter alia*, asked Sea Side to identify any expert witnesses and to provide any reports prepared by its experts.

---

[2]On cross-appeal, Sea Side does not challenge that portion of the district court's judgment which awarded SSR $11,086.86 on SSR's breach of contract counterclaim.

Sea Side did not identify any expert witness by the district court's December 15, 2000 deadline. Sea Side's June 20, 2001 interrogatory answers identified Baroni as one of five witnesses having knowledge of the facts of the case and also identified Baroni as the only expert witness Sea Side intended to call at trial. Sea Side also produced several reports prepared by Baroni.

On August 17, 2001, the district court notified the parties that the case had been scheduled for a bench trial. The notice directed the parties to, among other things,

> enter into written stipulations setting forth the qualifications of all expert witnesses in such form that they can be read to the Court by counsel at the time the expert witness takes the stand. A summary of each experts' testimony shall be exchanged between the parties and given to the Court along with other pre-trial submissions.

(J.A. 28-29).

Because the district court was closed for Columbus Day on October 8, 2001, the district court moved the trial date up to October 3, 2001. On October 1, 2001, the parties entered into a stipulation (the Joint Stipulation) which summarized each expert's qualifications and summarized the testimony each expert intended to give.

At trial, SSR timely objected to any expert testimony from Baroni, but did not timely object to the admission of Campbell's expert testimony. As to SSR's objection to Baroni's testimony, after a lengthy colloquy with counsel, the district court overruled the objection.

B

Rule 26(a)(2)(A) requires disclosure of the identity of any expert witness. Rule 26(a)(2)(B) requires the expert to prepare a report containing, among other things, "a complete statement of all opinions to be expressed and the basis and reasons therefor," the "data or other information considered by the witness in forming the opinions," and "the qualifications of the witness." Fed. R. Civ. P. 26(a)(2)(B). Rule

26(a)(2)(C) requires the report to be disclosed at least ninety days before trial or within thirty days after the opposing party has made its disclosures.

In this case, Sea Side did not satisfy Rule 26 for either Baroni or Campbell, a fact Sea Side does not dispute. To be sure, Sea Side never filed a report prepared and signed by Baroni that provided all of the information required by Rule 26. In addition, Campbell's report was not produced until the eve of trial.

According to Rule 37(c)(1), a "party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1) thus does not require witness preclusion for untimely disclosure if there is a substantial justification for the non-disclosure or if missing the deadline is harmless. *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995). The district court has broad discretion in deciding whether a Rule 26(a) violation is substantially justified or harmless. *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996).

Sea Side offers no justification, substantial or otherwise, for its failure to provide SSR with the expert reports that complied with Rule 26. To be sure, Sea Side hired Baroni more than three years before it brought this action and Campbell inspected the roof nearly a year before the action was filed. Thus, Sea Side had more than ample opportunity to comply with Rule 26.

We conclude, however, that the admission of Baroni and Campbell's testimony was harmless. The parties voluntarily signed and filed the Joint Stipulation, wherein the parties agreed upon the qualifications of Baroni and Campbell as experts and the document outlined the projected testimony of Baroni and Campbell. As to Baroni, the Joint Stipulation stated that: (1) it is stipulated between the parties that Baroni "is qualified as an expert to testify in the following areas: building code violations, construction defects and roofing problems"; (2) Baroni "has extensive experience with the roof at issue in this case"; and (3) the roof, "as installed, did not meet construction

requirements, manufacturer's specifications, industry standards or building code requirements." (J.A. 36-37). As to Campbell, the Joint Stipulation stated: (1) it is stipulated between the parties that Campbell "is qualified as an expert to testify in the following areas: evaluation of structural defects, defective construction, building code violations and roofing problems"; and (2) Campbell "will testify consistent with his report attached thereto, briefly summarized as follows . . . [f]ailure of the roof was a direct result of a major violation of the Standard Building Code." (J.A. 35-36). Baroni and Campbell's testimony at trial did not deviate from that outlined in the Joint Stipulation. SSR agreed to the language of the Joint Stipulation and acknowledged that it accepted and recognized the qualifications of both Baroni and Campbell and knew that the expert witnesses would express their opinions related to the roof installation and failure. By signing the Joint Stipulation, SSR acknowledged the experts, accepted the experts, recognized the qualifications of the experts, and stipulated that they would testify in accordance with the Joint Stipulation at trial. Because SSR voluntarily signed and agreed to the Joint Stipulation, it cannot be said that SSR was surprised or did not have an adequate opportunity to prepare for trial. *Cf. Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001) ("The purpose of a 'detailed and complete' expert report as contemplated by Rule 26(a) . . . [is to] prevent an ambush at trial."). Accordingly, we find no abuse of discretion by the district court in permitting the expert testimony of Baroni and Campbell.

## III

On cross-appeal, Sea Side argues that the district court erroneously limited its damages on its negligence claim to *the original contract amount* paid to SSR in 1990, $85,900, rather than the $172,000 Sea Side spent in 1999 to install a new roof on the Building. Noting that the general rule of damages in negligence actions is to place the injured party in the same situation it would have occupied if the wrong had not been committed, the district court reasoned that its damage award "reflected its assessment of the proper amount of damages that would adequately compensate the plaintiffs for the defendants' negligent installation of the roof in question." (J.A. 648). Through its damage award, the district court apparently sought to

restore Sea Side to the position it occupied in 1990 before SSR installed the roof by returning the purchase price and leaving Sea Side with a roof that needed to be replaced.

South Carolina's economic loss rule provides that, where a buyer's expectations in a sale are frustrated because the product does not work properly, the buyer's remedies are limited to those prescribed by the law of contract. *Kennedy v. Columbia Lumber and Mfg. Co.*, 384 S.E.2d 730, 736 (S.C. 1989). This doctrine demarcates the boundary between contract law and tort law in product liability cases by helping to determine which theories are applicable in a given action. *Bishop Logging Co. v. John Deere Indus. Equip. Co.*, 455 S.E.2d 183, 188 (S.C. Ct. App. 1995). Its contours and rationale have been carefully explained in *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027, 1049-56 (D.S.C. 1993), *aff'd*, 46 F.3d 1125 (4th Cir. 1995) (unpublished table decision). Most fundamentally, the economic loss rule distinguishes between transactions involving the sale of goods, where contract law protects economic expectations, and transactions involving the sale of defective products to individual consumers, whose injuries are traditionally remedied by the law of torts. *Id.* at 1049.

In this case, Sea Side contracted for the installation of a roof supplied by SSR. The predominant thrust of this transaction was to provide and install the roof. At first blush, then, the economic loss rule would seem to bar any negligence claim. Indeed, the economic loss rule bars a negligence claim "where duties are created *solely* by contract." *Kennedy*, 384 S.E.2d at 737. Where there is a special relationship between the parties that is independent of the contract, however, there exists a duty of care whose breach will support a tort claim. *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995). For example, South Carolina courts have permitted negligence claims to proceed against accountants and attorneys based on their professional duties to plaintiffs. *Id.* While no special relationship exists between SSR and Sea Side, a violation of a building code violates a legal duty for which a builder can be held liable in tort to the homeowner. *Kennedy*, 384 S.E.2d at 737; *see also Beachwalk Villas Condo. Ass'n, Inc. v. Martin*, 406 S.E.2d 372, 373-74 (S.C. 1991) (holding an architect can be liable for negligence and breach of an implied warranty even though

no privity exists between the architect and the condominium home-owners association); *cf. Palmetto Linen Serv., Inc. v. U.N.X., Inc.*, 205 F.3d 126, 129 (4th Cir. 2000) (holding that, in case involving the installation and malfunction of a chemical dispensing system used for commercial washers that resulted in destruction of linens, South Carolina economic loss rule precluded negligence claim because, among other things the plaintiff did not "claim that defendants violated any code provision or contravened any industry standard"). This well-recognized exception to South Carolina's economic loss rule allows Sea Side to assert a negligence claim for building code violations.

In a construction case such as this, the measure of damages that must be awarded as a result of a builder's negligence is the reasonable cost to repair. *See, e.g.*, *Scott v. Fort Roofing and Sheet Metal Works, Inc.*, 385 S.E.2d 826, 827 (S.C. 1989) ("Cost of repair or restoration is a valid measure of damages for injury to a building although compensation may be limited to the value of the building before the damage was inflicted."); *Coleman v. Levkoff*, 122 S.E. 875, 876 (S.C. 1924) ("If . . . the owner has the property repaired and restored to a condition in which its market value equals or exceeds the market value before the injury, the measure of damages in that case is the reasonable cost of restoring the property to its previous condition."). Consequently, in order to restore Sea Side to its preinjury status and to compensate Sea Side for the negligent actions of SSR, the measure of damages is the reasonable cost to repair the defectively installed roof.

In this case, however, in calculating the award of damages, the district court did not calculate the reasonable cost to repair the roof, but rather used *the original contract price* to restore Sea Side to the position it occupied in 1990—the need for a new roof on one of its buildings. This was error. *Id.* The district court should have calculated the reasonable cost to repair the roof and awarded damages based on that finding. Accordingly, a remand is required for further factual findings concerning the reasonable cost to repair the roof.[3]

---

[3]We note that Sea Side introduced evidence below that it spent $172,000 installing a new roof on the Building. There is also evidence in the record suggesting that the new roof contained additional features

Sea Side also claims that the district court erred by disallowing damages for interior repairs which flowed from the negligence cause of action. According to Sea Side, the district court improperly held that the damage to the interior of the Building was excluded and not recoverable pursuant to the provisions of the Membrane Systems Warranty and Membrane Material Warranty which excluded coverage for consequential damages.

We agree with Sea Side that the Membrane Systems Warranty and the Membrane Material Warranty cannot be used to defeat its right to proceed against SSR on a negligence theory. Under South Carolina law, the election of remedies is the act of choosing between different remedies allowed by law on the same set of facts. *Jones v. Winn-Dixie Greenville, Inc.*, 456 S.E.2d 429, 431 (S.C. Ct. App. 1995). Its purpose is to prevent double recovery for a single wrong. *Save Charleston Found. v. Murray*, 333 S.E.2d 60, 64 (S.C. Ct. App. 1985). Where a party has asserted only one primary wrong, he is entitled to only one recovery. *Jones*, 456 S.E.2d at 432. However, the principle has no application where two separate causes of action, each based on different facts, exist. *Robert Harmon and Bore, Inc. v. Jenkins*, 318 S.E.2d 371, 376 (S.C. Ct. App. 1984).

In this case, because Sea Side's negligence, breach of contract, and breach of warranty claims are based upon the same facts and because Sea Side's damages on its breach of contract and breach of warranty claims would be cumulative to the damages on its negligence claim, Sea Side was entitled to proceed solely on its negligence claim, and it in fact prevailed on that claim. Once Sea Side prevailed on its negligence claim, its remaining theories for recovery (breach of contract and breach of warranty) became irrelevant. The only issue before the district court in assessing damages under Sea Side's negligence claim was whether the damages to the roof and the damages to the interior

---

that Sea Side rejected as too expensive when it contracted with SSR in 1990. Of course, Sea Side is not entitled to be placed in a superior position by asking SSR to pay the cost of providing Sea Side with a more expensive and technologically superior roof. Rather, as noted above, Sea Side is entitled to damages equaling the reasonable cost to repair the roof.

of the Building were proximately caused by the building code violations. The Membrane Systems Warranty and the Membrane Material Warranty were irrelevant to this determination and should not have been considered by the district court.[4]

In summary, because the district court made no factual findings concerning whether the damage to the interior of the Building was proximately caused by SSR's negligence, *i.e.*, violation(s) of the Code, a remand for further factual development is necessary.

IV

As noted above, under South Carolina law, the election of remedies is the act of choosing between different remedies allowed by law on the same set of facts. *Jones*, 456 S.E.2d at 431. Because Sea Side's negligence, breach of contract, and breach of warranty claims are based upon the same facts and because Sea Side's damages on its breach of contract and breach of warranty claims would be cumulative to the damages on its negligence claim, we decline to address Sea Side's arguments attacking the district court's dismissal of Sea Side's breach of contract and breach of warranty claims. *Cf. Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 381 n.10 (4th Cir. 1999) ("Because Minyard's negligence and breach of con-

---

[4]In any event, even if we were to conclude that the district court was correct in examining the Membrane Systems Warranty and the Membrane Material Warranty in assessing whether Sea Side was entitled to recover for damages to the interior of the Building, we would reach the same result. In *Waters v. Massey-Ferguson, Inc.*, 775 F.2d 587 (4th Cir. 1985), applying South Carolina law, we permitted recovery of consequential damages to a farmer flowing from a defective tractor, even though the warranty the farmer received from the defendant contained an exclusion of such damages. We held that recovery was permissible under the narrow facts of the case because the parties premised the warranty provisions on certain repairs being made, but repair efforts never proved successful. *Id.* at 591-92. Once repair became impossible, we held that the limitation of consequential damages no longer applied. *Id.* In this case, SSR, like the defendant in *Waters*, had numerous opportunities to repair the roof, but such attempts failed. Under such circumstances, the limitations on consequential damages contained in the Membrane Systems Warranty and the Membrane Material Warranty would not apply.

tract claims are based upon the same facts, and because we conclude Minyard may recover based upon his negligence claim, we do not reach its breach of contract claim.").

## V

For the reasons stated herein, the judgment of the district court is affirmed in part, vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART,
AND REMANDED*